**FLONA CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 95-62-M-Civil-EC.**

United States District Court
S. D. Florida,
Miami Division.
April 29, 1963.

Cyrus A. Neuman, Miami, Fla., for plaintiff.

Lavinia L. Redd, Asst. U. S. Atty., Miami, Fla., Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, George A. Hrdlicka, John F. Murray, Attys., Department of Justice, Washington, D. C., for defendant.

STEPHENSON, District Judge, sitting by assignment.

This is an action brought under 28 U. S.C. § 1346(a) to recover income taxes allegedly overpaid. The government has denied the claim of the plaintiff and has filed a counterclaim alleging that additional taxes are due. The case was tried to the Court without a jury.

There are three issues for determination by the Court: 1. Has the taxpayer carried his burden of proving an ascertainable basis at the time of the purchase of the cost of goods sold, the "goods" being sod which was purchased in a lump sum payment for the sod and the land on which it was growing? 2. Is the taxpayer entitled to a deduction for depletion of top soil under Section 611 of the Internal Revenue Code of 1954? 3. Has the taxpayer sustained a deductible casualty loss as a result of the destruction by frost of growing sod?

Plaintiff, the taxpayer, is a Florida Corporation that owns land from which sod is taken. The specific product is Saint Augustine grass which is produced and sold to homeowners. Plaintiff in July 1957 purchased a tract of 180 acres in Palm Beach County, known as the Gilbert tract, for the price of $28,742.68.

The parties have stipulated that at the time of the purchase two million square feet of sod was growing on the land. During the next two fiscal years [1] following this purchase, plaintiff sold the entire two million square feet of growing sod. On its tax returns for these years plaintiff claimed a total of $10,000 as a deduction for depletion resulting from the sale of the sod. Plaintiff now claims that the $10,000 is properly allowable as a cost of goods sold and not as a depletion. The government contends that no deduction is allowable regardless of what it is called. However, the government does concede that plaintiff would be entitled to a cost of goods sold if the growing sod which was sold had an ascertainable basis.

■ The plaintiff has shown that the land in an unimproved condition had a fair market value of approximately $100 per acre, or $18,000 for the entire tract, and from this it has estimated that the value of the sod growing on this tract at the time of purchase was $10,000. Since there were approximately 66 acres of growing sod this results in an allowable value of $150 per acre for sod. Testimony offered indicates the prevailing price of St. Augustine sod at that time was at least $150 per acre. It is the opinion of the Court that the taxpayer has proved that the allocation was substantially ascertainable and was appropriate and should be allowed in the sum of $10,000. The amount allowed for 1958 is $7,838.50 based on the sale of 1,567,700 square feet of the sod and the amount allowed in 1959 is $2,161.50 based on the sale of the remaining 432,300 square feet of the aforementioned sod.

■■ The second question raised requires the Court to determine whether or not a cost depletion allowance should be granted to persons engaged in the business of holding land which is used for sod farming of Saint Augustine grass. The harvesting of Saint Augustine grass sod requires the removal of one and one-half to one and three-quarter inches of top soil. It is the plaintiff's contention that

[1]. Fiscal years ending March 31, 1958 and March 31, 1959.

this sod which is a combination of soil and plant life, is a "natural deposit" and therefore a depletion allowance should be allowed under Section 611 of the Internal Revenue Code. Apparently this is a case of first impression. The plaintiff relies upon Revenue Ruling 78, 1953–1 Cum.Bull. 18, which states that "Soil in place is a natural deposit within the meaning of Section 23(m) of the Internal Revenue Code (Section 611 of the 1954 Code). If such soil is severed and sold by the landowner, the proceeds are ordinary income subject to a depletion allowance * * *." The government contests the fact that this soil being removed is a "natural deposit" as that term is used in Section 611 and notes that soil, sod, dirt and turf are specifically excluded from the term "all other minerals" as that term is used in Section 613(b) (6), referring to percentage depletion. As such, this Section is not applicable to the controversy now before the Court except to the extent that it may shed some light on the legislative intent. Regulation 1.611–1 (d) contains definitions of certain words but nowhere does it define "natural deposits." It does tell us at subparagraph (5) that "Minerals * * * includes but is not limited to all of the minerals and other natural deposits subject to depletion based upon a percentage of gross income from the property under section 613 and the regulations thereunder."

The government has urged that a depletion allowance was never intended for this type of operation as is indicated by Revenue Ruling 54–241, 1954–1 Cum. Bull. 63, wherein it is stated that "a deduction is not permitted for the 'depletion' of soil incident to farming operations; but the farmer is permitted to deduct as a business expense the cost of maintaining the productivity of the land. * * * Revenue Ruling 78, C.B. 1953–1, 18, is not applicable to this situation." The plaintiff urges that this regulation is not applicable because this ruling assumes that it is possible to restore the productivity of the land by the addition of other soil which the evidence in this case shows would not be economically fea-

sible in this type of a sod farming operation.

One further Revenue Ruling should be mentioned. Rev.Rul. 55–730, 1955–2 Cum.Bull. 53 provides that "the cost of farm land with peat soils which by reliable estimate will subside to the extent of wide-scale abandonment within the next half century may not be recovered by depreciation or depletion allowances." This subsidence "is not a mining operation in which minerals are extracted from the lands, and the depletion provisions are not applicable."

It is the opinion of the Court that Saint Augustine sod is a "natural deposit" as that term is used in Section 611, and that Revenue Ruling 54–241 is not applicable to this case of the removal of Saint Augustine grass because, although the productivity of the land can be restored by fertilization, there has been an actual loss of soil and hence loss of the length of production, which cannot be restored except at costs which are totally prohibitory. This probably should not be categorized as a "mining operation" but nevertheless is distinct from subsidence which is the subject of Revenue Ruling 55–730. This Court is therefore of the opinion that a depletion allowance is within the purview of 611 and should be granted under the facts now before the Court.

The amount of the depletion is another question. The plaintiff has shown that the process of harvesting this type of sod requires the removal of approximately one and one-half to one and three-quarters inches of soil. The plaintiff also claims that the Schawno Drainage District maintains the water level at 12–18 inches below the surface of the land and therefore, in an attempt to be conservative, estimates that the number of one and one-half to one and three-quarter inch cuttings that could be taken off the land would be eight since when you get too close to the water level the ground becomes too soggy to work. The evidence shows that when this level is reached the land would be practically valueless. Again attempting to be conservative, the

plaintiff concedes a residual value of $2775 or about $15 per acre.

Assuming these claims of the plaintiff to be true, there are still two other factors to be taken into consideration. First, there is an average of five to six feet of this black muck above the rock which may be reclaimed should the water level in this drainage district be lowered. Since this is land that was once under water and the purpose of the drainage district is to make the land useful, it is more than a theoretical possibility that the water level could be lowered in the future. There is also evidence that the land is useful until the depth of the black muck is reduced to two feet. Secondly, there is no evidence as to the value which the land may have after less than five or six of these cuttings. Presumably the value would not be substantially decreased as it appears that vegetable crops or sugar cane grows quite satisfactorily under these or similar conditions. In fact the Gilbert tract is presently used for growing sugar cane rather than for sod farming.

■ In light of these facts the Court is of the opinion that the amount of the available muck is between three and four feet. Assuming the average, that is three and one-half feet, then the depletion computation should be on the basis of three and one-half times the 63,350,-000 units of topsoil claimed by the plaintiff, or 221,725,000 units.[2] Consequently the cost per unit would be $.0000720157.[3] Thus the depletion value of 1,567,700 units harvested in 1958 would be $112.90. The depletion value of the 1,319,516 units harvested in 1959 would be $95.03.

This brings us to the last issue for determination by the Court which involves the deductibility of a casualty loss as a

result of frost. On September 30, 1959, plaintiff purchased 800 acres of land known as the "Adams Tract" for a total purchase price of $129,350.[4] At the time of the purchase Saint Augustine grass was growing on the entire tract, however it was too tall for harvesting as sod so an effort was immediately made to mow the top of the grass down to a height suitable for removal as sod. This mowing plus the lack of fertilizer, which was intentionally left off because growth was not being encouraged, put the grass in a weakened condition. During the month of January in 1960 while the grass was in this condition the temperature dropped below freezing for several hours a day for three days. As a result of this cold weather the grass on 560 acres was killed. All attempts to revive the grass failed and as a consequence the fields have grown up with foreign grasses unsuitable for sod and thereafter attempts to take sod from the 560 acres were abandoned. It is on these 560 acres which the plaintiff claimed a casualty loss. The claim was originally allowed but is now the basis of the government's counterclaim.

■ Regulation 1.165-6(c) states:

"The total loss by frost, storm, flood or fire of a prospective crop being grown in the business of farming shall not be allowed as a deduction under Section 165(a)."

This regulation should be followed unless a compelling reason to the contrary is found to exist. Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1947). There does exist here, however, a serious question as to the applicability of the regulation. The first reason advanced by the plaintiff for its inapplicability is that it only applies to crops "being grown" and

---

2. The 63,350,000 figure was determined by multiplying 7,918,750 (the number of square feet on the farm) by 8 (the number of cuttings proposed by the plaintiff).

3. This figure is arrived at by dividing the purchase price of the topsoil ($15,967.68) by the number of units to get the cost per unit. The purchase price of the

topsoil ($15,967.68) is the cost of the land without the then existing crop ($18,-742.68) less the residual value of the land ($2775.00).

4. Of this, $100 per acre or $80,000 was allocated to the cost of the land and the balance, $49,350, was allocated to the cost of the grass.

here the grass was fully grown before the grass was killed by the cold weather. To put such a construction on the term would be unnatural. "Being grown" would better be interpreted to also include the final processes necessary to put the crop in a marketable condition. The fact that this crop was being cut down to a height suitable for harvesting rather than being allowed to "grow" does not alter the principle of the regulation. The evidence shows that the point of finality of reaching a marketable condition had not been reached at the time of the freeze.

"Being grown" could also be interpreted in this regulation to include all acts of growing the crop. That is, to give it the broad meaning of requiring that the person seeking the deduction be the person who was a part of the entire growing operation. This would limit the effect of this regulation and hence would make it inapplicable to this plaintiff. A better approach to the same result has been argued by the plaintiff. That is, instead of stretching the term "being grown", exclude the situation where the taxpayer has not incurred any expenses of growing the crop from the coverage of the regulations for the reason that the regulation was only intended to prevent a taxpayer from getting a double deduction.

In the ordinary case the farmer that raised the crop would have a deduction for his costs of planting the crop. Here, however, no such costs have been incurred by this party. Instead the costs of raising the crop were those of the person from whom the plaintiff purchased the land, which costs were reflected in the purchase price. The cost of another company in preparing the grass for removal is a separate matter. The plaintiff here is only the landholder. It bought the land with a growing crop. To deny plaintiff's claim here would be inconsistant with the granting of a cost of goods sold deduction to which the plaintiff would have been entitled had the crop not been destroyed. Regulation 1.165–6(c) must be interpreted to apply only to the situation where the person seeking the casualty loss deduction also has costs of production which are properly deductible. This principle is pointed out by comparing Regulations 1.165–6(d) (1) and (2). By means of these two regulations a distinction is properly drawn between animals that are purchased and animals which are raised on the farm and for which the owner has other proper provisions under which to deduct the equivalent of the purchase price of the animals. To deny the casualty loss deduction in the case now before the Court would be to ignore the distinction between "purchased" crops and crops grown completely by a farmer; a distinction that the regulations recognize in Sections 1.165–6(d) (1) and (2). See also, Hadaway v. Commissioner, 13 B.T.A. 986 (1928) (allowed casualty loss for flood damage to land planted with cranberries); Wilson v. Commissioner, 12 B.T.A. 403 (1928) (allowed casualty loss for destruction by disease of grapevines).

The casualty loss will be allowed and the defendant's counterclaim is therefore denied.

It is ordered:

1. The $7,838.50 and $2,161.50 deductions, plus interest, claimed for 1958 and 1959, respectively, as cost of goods sold from the Gilbert tract are allowed.

2. The claim of the plaintiff for depletion allowance for 1958 and 1959 reduced to the amount of $112.90 and $95.03, respectively, plus interest, is allowed.

3. The $2,702.05 plus interest claim of the defendant is denied.

It is further ordered:

The plaintiff will prepare an appropriate decree which will be submitted to the Court after the form thereof is approved by the defendant.